Opinion

per curiam:

These cases present the claims of certain special groups of nonoperating employees of the Alaska Eailroad for overtime pay under section 23 of the Act of March 28, 1934, 48 Stat. 522, 5 U. S. C. 673c.
*946 The types of employees involved are (1) administrative, accounting and clerical employees, (2) river steamboat employees, (3) Esta coal mine employees and (4) dock long-shore employees. The cases were heard by a commissioner of the court, and evidence was presented as to the type and hours of work of these classes of employees, and the practices of the railroad in paying them. Only the issue of liability is before us at this stage of the proceeding.
The statute cited above is applicable to these employees and they are entitled to recover. Our decisions in Poggas v. United States, 118 C. Cls. 385, Parmenter v. United States, 125 C. Cls. 35, and Nelson v. United States, No. 48566, this day decided, ante p. 877, state the applicable principles.
Further proceedings to determine the amount of the judgments may be had under Rule 38 (c).
It is so ordered.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Richard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. Following the decision in the case of Poggas v. United States, 118 C. Cls. 385, the parties agreed to present to the court for determination the claims of other nonoperating employees and certain special groups employed by The Alaska Railroad as distinguished from nonoperating employees of the type exemplified by Mr. Poggas. The claims of these nine plaintiffs (Alex Artenian, Daniel C. Bedford, Lester A. Gossage, and Delbert L. Wolfe in No. 48637; Fred Dorn and Leon M. Dow in No. 49036; and Robert O. Albritton, Edward G. Barber, and John T. Cunningham in No. 49888) were accordingly selected as test plaintiffs. Only the issue of liability fs presented at this time, the issue as to damages being reserved for future determination.
2. These plaintiffs are all employees or past employees of The Alaska Railroad, an agency of the United States. All of them during at least a part of their service were employed in one or more of the following classes of service: (a) administrative, accounting, and clerical; (b) river *947 steamboat; (c) Eska coal mine; and (d) dock longshoremen. Of these, only the first is a standard department on American railroads; the others are peculiar to The Alaska Railroad.
3. This action was instituted to recover overtime compensation under section 23 of the Act of March 28, 1934 (48 Stat. 522, 5 U. S. C. 673c), which reads as follows:
The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage-fixing authorities, shall be re-established and maintained at rates not lower than necessary to restore the full weekly earnings of such employees in accordance with the full-time weekly earnings under the respective wage schedules in effect on June 1, 1932: Provided, That the regular hours of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one half.
4. Pursuant to the provisions of the Act of March 12, 1914 (38 Stat. 305, 48 U. S. C. 301), authorizing him to construct a railroad in Alaska, to employ such officers, agents, or agencies, in his discretion, as might be necessary to enable him to carry out the purposes of the act, and to fix the compensation of all officers, agents, or employees appointed or designated by him, the President of the United States on June 8, 1923, promulgated Executive Order 3861 which authorized the Secretary of the Interior to operate the railroad “in all respects and to all intents and purposes, the same as if the operation thereof had been placed by law under the jurisdiction of the Secretary of the Interior.”
5. On January 11,1929, the Secretary of the Interior prescribed regulations governing the office of the general manager of The Alaska Railroad. They provided, among other things, that:
The following matters must be presented to and receive the approval of the Secretary before becoming effective:
* * * * *
(7) Increases or decreases in rates of pay, or changes in working conditions, of any class or body of employees (except minor changes).
*948 By Order No. 2327, May 29, 1947, of the Department of tbe Interior, the authority of the general manager of The Alaska Railroad to act for and in place of the Secretary of the Interior, was limited, among other ways, as follows:
The following matters must be presented to and receive the approval of the Secretary before becoming effective:
$ ‡ $ :gs
(5) Proposed policies and procedures for dealing with employees and their representatives in the determinations of rates of pay and methods of compensation, regulation of working hours, working rules and adjustment of grievances, as well as proposed increases or decreases in rates of pay or changes in methods of compensation, regulation of working hours, or in the basic working rules of any employee by class, craft, department or appropriate subdivisions thereof. 43 CFR, 1947 Supp., 4.530 (Book 5, p. 6016).
6. During all periods of time relevant to these proceedings the rates of pay of employees of The Alaska Railroad, including plaintiffs, have been fixed by wage boards or other wage-fixing authorities and in accordance with the following procedure:
The general manager of the railroad, after conferences with the union representatives of the employees (sometimes referred to as collective bargaining negotiations) which may or may not result in an agreement, submits proposed increases or adjustments in wage schedules for the approval of the Secretary of the Interior or, during a part of the period covered by these proceedings, to his delegate, the Special Ad-visor on Labor Relations. In those cases where the employees were not members of a union or for some other reason were not represented at the time salary or wage adjustments were being made, the general manager undertook to adjust the wages of such employees in a manner consistent with agreements reached with union representatives of other employees. There is no evidence that the Secretary of the Interior, during the period involved in .these cases, ever disapproved a proposed wage schedule agreed to by the general manager and the employees’ representatives. In one instance, namely in 1947, when the general manager and the employees’ representatives were unable to reach an agree *949 ment, the entire matter was referred to tbe Secretary of the Interior for decision who, after a hearing, determined that the proposal as made by the general manager for the adjustment of the controversy should be changed in certain respects more favorable to the employees and he issued an order putting new wage schedules into effect in conformity with his determination of the entire matter, but without having secured the approval of the employees’ representatives.
In arriving at approved wage rates in these conferences and negotiations for employees of the type ordinarily employed by railroads, consideration is given to rates paid employees performing similar duties on railroads in the continental United States. In the case of riverboat employees, the practices and policies of the maritime industry were followed as closely as possible and the rates of pay of the Inland Waterways were used as a base in determining the rates of pay for such employees. In the case of Eska coal miners, their wages were fixed by reference to the wages of employees of the Evans Jones Coal Company, a privately owned and operated coal mine within a few miles of the Eska mine. In addition, in view of higher living costs in Alaska, an effort is made to maintain Alaska Eailroad wages at a level at least 25 percent higher than wages for comparable positions in the continental United States. This percentage is not rigidly applied as a maximum and in instances might be greater. Basic compensation in recent years has been modeled generally upon that prevailing on the Northern Pacific Kailway with the Alaska differential being added thereto to cover the higher cost of living in that territory. The cost of living differential for both operating and nonoperating employees of The Alaska Eailroad has been based, since May 1,1948, on a differential between Seattle and Alaska railbelt consumer prices of 44 to 45 percent. The actual differential in pay rates between The Alaska Eailroad and the Northern Pacific Eailway has been more than 44 percent for lower wage employees and less than 44 percent for higher wage employees. Where inequities result in particular instances from the general application of a wage scheme, The Alaska Eailroad endeavors to iron them out by appropriate adjustments with the concurrence of the employees’ union representatives.
*950 7. The respective positions held by the plaintiffs with The Alaska Railroad, and the periods during which they occupied such positions, are as follows :
(a) Alex Artenian. Mr. Artenian was working for The Alaska Railroad on March 28,1934, as a laborer in the maintenance-of-way department. In October and December 1940, he worked for brief periods as a trucker in the same department. Otherwise he continued in his employment to June 1941, when he began performing work as a pitman in the same department, alternating that work with that of laborer to April 1942, when he became a yardman in the stores department. In September 1942, he became a janitor at headquarters, in December 1942, a fireman in the operating department, in March 1943, an outside laborer and mucker in the mines department, and in July 1944, a yardman in the stores department. He continued in this latter employment at least through April 1948. He was paid at an hourly rate throughout the above period of his employment.
(b) Daniel C. Bedford. Mr. Bedford was employed by The Alaska Railroad on August 1,1939, as a longshoreman and laborer in the operating department, and alternated in those two positions until August 1941, when he began working exclusively as a longshoreman. From March to July 1943, he served as foreman and volunteer fireman, in May 1944, he became foreman and volunteer fireman, in June 1945, he became foreman and assistant fire chief, and in October 1945, he became assistant general dock foreman and assistant fire chief. He resigned on June 30, 1947. As foreman and assistant foreman he was paid on the monthly basis until the Federal Employees Pay Act of 1945 was placed in effect when he was changed to an hourly basis. Otherwise he was paid on the hourly basis.
(c) Lester A. Gossage. Mr. Gossage was employed by The Alaska Railroad on June 23,1934, as a truckman in the operating department. He worked in this capacity and as a laborer in the same department through June 1935, when he became a longshoreman in the same department. He worked in this capacity, with brief periods when he was carried on the payroll as a laborer, through August 12, 1946, when his employment terminated. He was paid on an hourly basis throughout his period of employment.
*951 (d) Delbert L. Wolfe. Mr. Wolfe was employed by The Alaska Eailroad from May to September 1941, as a laborer in the maintenance-of-way department. He was re-employed in August 1942, as a longshoreman in the operating department. He worked for The Alaska Eailroad continuously to November 1947, as a longshoreman except for the periods from February through June 1944, from May through December 1945, in January 1946, and from May 1946 to the termination of his employment, during which periods he was a laborer in the maintenance-of-way department; He was paid on an hourly basis throughout his period of employment.
(e) Fred Dorn, Mr. Dorn was employed in the operation of river boats owned by The Alaska Eailroad in every year from prior to 1934 through 1946. This was a seasonal employment, from sometime in April of each year to a date in October, depending on the length of the navigation season. Mr. Dorn held at various times the ratings of third engineer, assistant engineer, and chief engineer on these vessels.
(f) Leon M. Dow. Mr. Dow worked for The Alaska Eailroad on the river boats in each season from 1934 through 1942. In addition to his work on these vessels, which was always as chief engineer, there were short periods prior to the opening of the navigation season in 1934,1935,1936, and 1937, when Mr. Dow was employed as a first-class mechanic in the mechanical department. Prior to and following the navigation seasons in 1938,1939, and 1940, Mr. Dow was employed for varying periods of time as port engineer at Seattle and at Nenana, the river boat terminal.
(g) Eobert O. Albritton. Mr. Albritton was working for The Alaska Eailroad on March 28,1934, as an accountant in the maintenance-of-way department. He continued in this position until his retirement on December 30,1946. He was paid on a monthly basis until the Federal Employees Pay Act of 1945 was placed in effect, after which he was paid on an hourly basis.
(h) Edward G. Barber. Mr. Barber was working for The Alaska Eailroad on March 28,1934, as a clerk at headquarters in Anchorage. From December 1938, to June 1940, and from August 1940, through December 1940, he served as *952 clerk and auxiliary fireman, also at headquarters. In September 1941, he became chief timekeeper at headquarters and continued in this position through 1942. On January 1,1943, he became a clerk in the accounting department, in December 1944, an accountant in the same department, and in June 1946, an assistant disbursing officer in that department, the position he held on December 31, 1947. He was paid on a monthly basis until the Federal Employees Pay Act of 1945 was placed in effect when he was changed to an hourly basis.
(i) John T. Cunningham. Mr. Cunningham was superintendent of transportation on The Alaska Railroad on March 28, 1934, a position he held through December 31, 1947. He was paid on a monthly basis until the Federal Employees Pay Act of 1945 was placed in effect, after which he was paid on an hourly basis.
8. By General Circular No. 310 of The Alaska Railroad, dated July 15, 1932, the Economy Act of June 30, 1932, 47 Stat. 400, providing for compulsory time off without pay for certain employees of the Federal Government, was applied as of July 1, 1932, to all employees of The Alaska Railroad (including the plaintiffs).
9. By General Circular No. 323, of The. Alaska Railroad, dated April 1, 1933, the Economy Act of March 20,1933, 48 Stat. 8, providing for a percentage reduction of pay for certain employees of the Federal Government, was applied to all employees of The Alaska Railroad (including the plaintiffs) as of April 1,1933.
10. June 8,1934, the general manager of The Alaska Railroad issued to “all concerned” the following General Circular No. 344:
The Independent Offices Appropriation Act, 1935 (Public No. 141,73d Congress, March 28,1934) provides in part as follows:
“Sec. 23. The weekly compensation, minus any general percentage reduction which may be prescribed by Act of Congress, for the several trades and occupations, which is set by wage boards or other wage-fixing authorities, shall be reestablished and maintained at rates not lovrer than necessary to restore the full weekly earnings of such employees in accordance with the full-time weekly earnings under the respective wage schedules in effect on June 1,1932: Pkovided, That the regular hours *953 of labor shall not be more than forty per week; and all overtime shall be compensated for at the rate of not less than time and one-half.”
As Section 23, quoted above, applies to The Alaska Eailroad, effective during the week ending June 16, 1934, and thereafter until Section 23 is amended or repealed, the weekly hours of service of employees to whom it is applicable will be 40 hours per week and the weekly compensation shall be the same as paid on June 1, 1932.
While the regular hours of work of per annum and per month employees within the terms of Section 23 of the Independent Offices Appropriation Act, 1935, are required to be fixed at not to exceed 40 per week, whereas the regular hours previously may have been 44 or 48 per week, the rate of compensation should remain on the same annual or monthly basis, the only adjustment, if any, required being that necessary to pay an annual rate not lower than that received June 1, 1932, for the same duties, less the percentage reduction.
No overtime shall be worked except in case of extraordinary emergency. If, in case of an extraordinary emergency, employees are required to work more than the regular hours on any one calendar day, but are not required to work in excess of 40 hours during the week, payment of overtime compensation is not authorized. The term “overtime” is not applicable to employees paid on an annual or monthly basis and there is no purpose or intent shown by Section 23 to extend the right to overtime compensation to employees paid on an annual or monthly basis who may be required to work more than their regular tour of duty of 40 hours per week.
On July 13, 1934, the Comptroller General of the United States rendered an opinion, 14 Comp. Gen. 42, upon a submission by the Secretary of the Interior, holding that section 23 of the act of March 28,1934, was inapplicable to employees of The Alaska Eailroad because, as he said, “Eailroad employees are regarded generally as a distinct class of personnel and their occupations as not being within ‘trades and occupations’ of mechanics and laborors as employed in section 23 of the act of March 28,1934.”
Application of General Circular No. 344 continued until July 15, 1934, when the general manager issued General Circular No. 347, also to “all concerned,” reading as follows:
*954 The Comptroller General of the United States advises that The Alaska Eailroad employees are not subject to Section 23 of the Independent Offices’ Appropriation Act, 1935 (Public No. 141, 73d Congress, March 25, 1934), which regulated the weekly compensation, hours of work, and overtime compensation for the several trades and occupations in various Government Departments.
Effective July 15, 1934, the provisions of General Circular No. 344 are terminated and hours of service and/or salary rates will be re-established in all departments of the Eailroad in accordance with regulations in effect prior to June 10,1934, the effective date of General Circular No. 344.
Except for the period June 10 to July 15, 1934, and as outlined above in this finding, section 23 of the act of March 28,1934, was never made applicable by The Alaska Eailroad in determining the pay of its employees.
11. In General Circular No. 356 of The Alaska Eailroad, dated February 4, 1935, the percentage of reduction applicable to its employees under section 2 (b) of the Economy Act of March 20, 1933, was announced to be five percent.
12. General Circular No. 357 of The Alaska Eailroad, dated March 25, 1935, announced that in accordance with section 2 of Public Eesolution No. 3,74th Congress, approved February 13,1935, 49 Stat. 22, there would be no reduction of salaries on The Alaska Eailroad after March 31,1935.
13. Wage Schedule No. 12, signed April 25, 1929, and effective May 1,1929, remained in force from its effective date until it was superseded by Wage Schedule No. 13 which became effective May 1,1936, such wage schedule thus being in force on June 1,1932, and March 28,1934.
Wage Schedule No. 12 contained the following provisions with respect to overtime:
All overtime rates quoted in this schedule are for time worked on Sundays, holidays, and any time in excess of eight hours on regular work days. See separate sheet for overtime Mechanical Department.
*****
Overtime will be paid Deck Hands and Deck Boys at home terminals, at the rate of fifty cents per hour, when working cargo on Sundays or holidays, for each hour worked, and other days for each hour worked be *955 tween 6:00 P. M. to 6:00 A. M. The term “working cargo” means loading or unloading freight, and does not include handling mail, baggage or express.
Overtime rates are hereby authorized for monthly employees of the Mechanical Department, at rates listed below, engaged in emergency repair work, necessitated by Floods, Snow Slides, Wrecks, Marine Work, Marine Ways at Nenana, Operation of Gas Cars, Electrical and Water Works, for time worked on Sundays, Holidays, and any time in excess of eight hours on regular work days.
The salaries of all employees in the administrative, accounting and clerical groups were on a monthly or annual basis until July 1,1945, the effective date of the Federal Employees Pay Act of 1945, when they were placed on an hourly basis.
The salaries of some of the employees in the mechanical department and other nonoperating departments were likewise on a monthly or annual basis until July 1, 1945, when their salaries were changed to the hourly basis for the same reason as for the administrative, accounting and clerical group. Overtime allowed and paid to such employees was for the actual time worked in excess of an eight-hour day and it was computed in the following manner: From 365 calendar days a year there was deducted 52 Sundays and 7 holidays, thus leaving 306 regular work days a year. At eight hours a day, that amounted to 2,448 working hours a year and 204 working hours a month. The monthly pay was then divided by 204 in order to arrive at the hourly rate for actual overtime worked. This method of computing hourly rates for the payment of overtime on monthly salaries continued until May 1,1943, when it was revised in accordance with the act of May 7,1943.
14. Wage Schedule No. 13 became effective May 1, 1936, and superseded Wage Schedule No. 12. However, the wage and mileage rates for all operating services and the classes of employees involved in these proceedings remained the same as in Wage Schedule No. 12. By General Circular No. 397 dated June 20,1938, the employees of The Alaska Bail-road were advised of a general increase of 10 percent in their *956 rates of pay effective July 1,1938, such. announcement reading as follows:
Effective July 1, 1938, the rates of pay applying to positions with headquarters in Alaska, excepting the position of General Manager, as contained in Wage Schedule No. 13 and supplements thereto, are increased by ten (10) percent: Pkovided, that this provision establishes a rate of 64 cents per hour for laborers; AND Pkovided Further, that the increased rate is to continue only until the amount of $160,000 has been expended for this purpose.
That 10 percent increase was made permanent and was incorporated in Wage Schedule No. 14 which became effective July 1,1939, except that no change was made in the rate of pay for miners, the Eska Mine not being in operation at that time.
Contract employees other than the purser who operated the river steamboats received an interim increase of 10 percent for the 1937 season with the result that the general increase of 10 percent, effective July 1, 1938, as carried into the new Wage Schedule No. 14 was approximately 21 percent for these employees over and above the rates for similar classifications in Wage Schedule No. 13.
15. By General Circular No. 470 of The Alaska Railroad dated December 31,1941, the wages of substantially all of its employees, including both operating and nonoperating groups, were increased as of January 1,1942. Operating employees received a fiat increase of $28.50 as a monthly minimum with corresponding increases in daily, hourly and mileage rates. All nonoperating employees who were paid on a monthly or annual basis with certain minor exceptions received an increase of $25 per month, with proportionate increase in overtime rates. All nonoperating employees who were paid at an hourly or per diem rate received an increase of 1214 cents per hour except longshoremen who had previously received an interim increase in that amount, effective approximately June 1,1941, and except Eska Mine employees who had received an increase of 10 percent. All contract river boat employees were increased $150 per season. The foregoing increases were incorporated in Wage Schedule No. 15, effective January 1,1942.
*957 16. The increases in rates referred to in the preceding findings were made to correspond to an increase which the employees of the railroads in continental United States had received plus the cost of living differential. However, the increases granted to these latter employees were effective September 1, 1941, whereas the Comptroller General had held that, in the absence of specific statutory authority, an administrative retroactive increase in the wages of government employees could not be made. In order to give to the employees of The Alaska Railroad an increase for the period September 1 to December 31,1941, similar to that granted to employees on railroads in the continental United States, a bill was introduced in the 77th Congress which was enacted as Public Law No. 825, approved December 22, 1942. That statute provided for various increases for substantially all of the employees of The Alaska Railroad, including 7y2 percent for all operating groups. Nonoperating employees who were paid on a monthly or annual basis were given a retroactive increase of $22.50 per month and overtime pay for monthly employees of 11.03 cents per hour. Hourly and per diem employees were increased 1114 cents per hour with the same exceptions as appear in Circular No. 470. The retroactive increase for contract river boat employees was $135 per season. The bill provided that the increases should be “computed in accordance with the regular practice of The Alaska Railroad”.
17. On September 30, 1943, The Alaska Railroad issued General Circular No. 513 with respect to War Overtime Pay Act of 1943, which circular read as follows:
1. The Comptroller General in decision of August 21, 1943 (B-36217) held that the War Overtime Pay Act of 1943, approved May 7, 1943, Public Law 49, 78th Congress, is not applicable to employees of The Alaska Railroad whose wages are fixed and adjusted on a per diem, per hour, or piece work basis in accordance with administrative procedure, but that those of the Railroad employees whose wages are fixed and adjusted on a monthly or yearly basis come within the purview of the Act effective on and after May 1,1943.
2. Pursuant to authority contained in the War Overtime Pay Act, the rules and regulations promulgated by Civil Service Commission by Department Circular *958 No. 424, dated May 8,1943, or amendments thereto, will govern the administration of the Act in its application to the per annum and monthly employees of the Eailroad.
3. The Secretary of the Interior in Department Order No. 1775 of December 26, 1942, established throughout the Department a forty-eight hour administrative work week, and authority to establish the hours of duty in the field within the provisions of this order was delegated to. the General Manager. The hours of duty as now established for employees of the Alaska Eailroad will continue.
4. Pursuant to Department of the Interior Order No. 1821, dated May 26,1943, and Part III, Section 1 of Civil Service Commission Departmental Circular No. 424, the General Manager is authorized to order or approve overtime in excess of the administrative work week and to elect to grant compensatory time off from duty without loss of pay in lieu of overtime compensation to full-time per annum employees. Department heads will request the General Manager’s written approval for excess overtime work only in case of emergency and will also make a written report in duplicate to the General Manager at the close of each month showing record of such overtime in excess of the established work week of 48 hours with the reasons therefor. All employees are cautioned that excess overtime must be approved.
Overtime pay under the War Overtime Pay Act of 1943 was computed on a calendar basis and was limited to the employee’s basic compensation not in excess of $2,900 per annum in the same manner it was applied to employees in the classified service. Employees whose monthly or annual pay equaled or exceeded $2,900 a year received the maximum overtime pay of $52.36 per month for a forty-eight hour week, that is, 21.6667 percent of their monthly pay up to the maximum of $241.667 per month. The hourly rate for overtime in excess of forty-eight hours a week was determined by dividing the monthly rate up to $241.667 per month by 240 (30 days at 8 hours each) and multiplying the quotient thus found by 1%.
18. As shown in the preceding finding, the War Overtime Pay Act of 1943 did not apply to the operating employees nor to those nonoperating employees of The Alaska Eail-road who were paid on an hourly or per diem basis. As a result, negotiations were carried out between the manage *959 ment and representatives of the employees for the purpose of adjusting the compensation of the employees not otherwise provided for by the War Overtime Pay Act of 1943.
These negotiations culminated in an agreement effective October 1, 1943, on which date The Alaska Eailroad issued General Circular No. 516 putting these rates into effect. The rates agreed upon were included in Wage Schedule No. 16, effective December 1,1943.
In addition to the increases relating to the operating groups that circular and Wage Schedule No. 16 provided an increase of 15 cents per hour to all hourly and per diem employees, with overtime at one and one-half the hourly rate for work in excess of the established workweek of forty-eight hours, except for longshoremen and Eska Mine employees.
Wage Schedule No. 16 contains rates for hourly employees in the Eska Mine reflecting increases of 18 cents per hour for miners, 9 cents for muckers and approximately 13 cents for laborers. Although the wage schedule shows no increase to longshoremen, the rate actually paid longshoremen at the Seward docks was increased from $1.50 to $1.62 per hour beginning December 1,1943.
Wage Schedule No. 16 also provided an increase of $300 per season for all contract river steamboat employees which was incorporated in contracts for the following year.
19. Since the War Overtime Pay Act of 1943 did not provide for increases in compensation for all employees of The Alaska Eailroad and since the agreement referred to in the preceding finding, effective October 1,1943, which provided for increases in compensation for most of the employees of The Alaska Eailroad not covered by the War Overtime Pay Act of 1943 could not, under the rulings of the Comptroller General, be made retroactive administratively in the absence of specific statutory authority, a bill was introduced in the 78th Congress to authorize increases in wages for these latter employees for the period from May 1 to September 30,1943, inclusive. That bill was enacted as Public Law No. 548, approved December 23, 1944, 58 Stat. 916.
The rates of pay per hour for train and engine service employees provided in that act were the same as those set out in Wage Schedule No. 16, referred to in Finding 18. It *960 also provided for retroactive increases to nonoperating employees of 15 cents per hour to hourly employees and $1.20 a day to per diem employees other than longshoremen and Eska Mine employees.
By May 1, 1943, increases in rates of compensation given to practically all employees of The Alaska Railroad (without considering whatever increases they might be entitled to under section 23 of the act of March 28, 1934) amounted to more than 30 percent of applicable rates in effect June 1, 1932, and March 28, 1934, excepting hourly employees who worked as longshoremen and in the Eska Mine.
20. The following tabulation represents wage changes for certain employees in each of the groups involved herein:

*961 The salary and wage rates shown in the last column from Wage Schedule No. 16 do not include overtime pay provided by the War Overtime Pay Act of 1943 which provided, among other things, for an increase of 21.667 percent on the first $2,900 of their annual base pay.
Longshoremen at Seward were paid $1.62 per hour beginning December 1, 1943, although Wage Schedule No. 16 shows no increase.
21. General Circular No. 513, referred to in finding 17, was canceled effective July 1,1945, the provisions of the War Overtime Pay Act of 1943 having expired June 30, 1945. However, the War Overtime Pay Act rates were continued in effect by General Circular No. 559, dated July 2, 1945, until the establishment of new rates.
On November 20,1945, the Comptroller General rendered an opinion, 25 Comp. Gen. 409, upon a submission by the Secretary of the Interior, holding that section 203 of the Federal Employees Pay Act of 1945 (act of June 30, 1945, 59 Stat. 296, 297, 5 U. S. C. 901, 913) was applicable to employees of The Alaska Eailroad whose compensation was fixed on a monthly or yearly basis, but that the act had no application to employees of The Alaska Eailroad whose compensation was fixed on a per diem, per hour, or piecework basis. Material portions of that statute read as follows:
Sec. 102. (c) This Act, except sections 203 and 607, shall not apply to employees whose basic compensation is fixed and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose. * * *
Sec. 203. Employees whose basic rate of compensation is fixed on an annual or monthly basis and adjusted from time to time in accordance with prevailing rates by wage boards or similar administrative authority serving the same purpose shall be entitled to overtime pay in accordance with the provisions of section 23 of the Act of March 28, 1934 (U. S. C., 1940 edition, title 5, sec. 673c). The rate of compensation for each hour of overtime employment of any such employee shall be computed as follows:
(a) If the basic rate of compensation of the employee is fixed on an annual basis, divide such basic rate of com *962 pensation by two thousand and eighty and multiply the quotient by one and one-half; and
(b) If the basic rate of compensation of the employee is fixed on a monthly basis, multiply such basic rate of compensation by twelve to derive a basic annual rate of compensation, divide such basic annual rate of compensation by two thousand and eighty, and multiply the quotient by one and one-half.
22. By General Circular No. 514 of The Alaska Kailroad dated December 10, 1945, in accordance with the foregoing decision of the Comptroller General, section 203 of the Federal Employees Pay Act of 1945 was applied to certain railroad employees, including the plaintiffs, who were paid on a monthly or annual basis, effective on and after July 1, 1945. With certain exceptions not here material, that circular provided that “an administrative workweek of 48 hours consisting of six 8-hour days, commencing on Monday and ending not later than Saturday is prescribed, the first 40 hours of which will be the basic workweek.” Consistent with that circular, the general manager of The Alaska Railroad on the same day issued the following as Supplement No. 52 to Wage Schedule No. 16:

To All Ootncemed:

The Comptroller General in decision of November 20, 1945 (B-53243) held that employees of The Alaska Railroad whose salaries are fixed and adjusted on a monthly or yearly basis come within the overtime provisions of Section 203 of the Federal Employees Pay Act of 1945, effective July 1, 1945, but that the said act has no application to employees of The Alaska Railroad whose services are fixed or adjusted on a per diem, per hour, or piecework basis. Accordingly the overtime provision for monthly and per annum employees contained on page 14 of Wage Schedule No. 16 is amended as follows:
Overtime

Monthly and Per Armwrn Employees:

1. The rate of compensation for each hour of overtime employment for employees paid on a monthly or yearly basis shall be computed as follows:
(a) If the basic rate of compensation of the employee is fixed on an annual basis, divide such basic rate of *963 compensation by two thousand eighty (2,080) and multiply the quotient by one and one-half; and
(b)If the basic rate of compensation of the employee is fixed on a monthly basis, multiply such basic rate of compensation by twelve to derive a basic annual rate of compensation, divide such basic annual rate of compensation by two thousand eighty (2,080), and multiply the quotient by one and one-half.
2. Whenever, for the purpose of computing overtime pay under these regulations, it is necessary to convert a basic monthly or annual rate to a basic weekly, daily or hourly rate the following rules shall govern:
_ (a) A monthly rate shall be multiplied by 12 to derive an annual rate.
(b) An annual rate shall be divided by 52 to derive a weekly rate.
(c) A weekly rate shall be divided by 40 to derive an hourly rate.
(d) A daily rate shall be derived by multiplying an hourly rate by the number of daily hours of service required.
Pursuant to that supplement, employees of The Alaska Railroad whose salaries had been fixed on a monthly or yearly basis were thereafter paid on an hourly basis.
23. On February 11, 1946, the acting general manager of The Alaska Railroad issued Supplement No. 1 to General Circular No. 574, which read as follows:
Pursuant to wage negotiations and Supplement No. 40 to Wage Schedule No. 16, effective July 1,1945, the overtime rates of pay and regulations pertaining thereto as promulgated in General Circular No. 574, of December 10,1945, are administratively extended to employees of The Alaska Railroad paid on a per diem and per hour basis, except Longshoremen at Seward and Whittier, train and engine service employees, Eska Mine hourly employees, and River Boat employees.
On the same date the provisions of the above circular were incorporated in Wage Schedule No. 16 as Supplement No. 61 thereto.
24. Likewise on February 11,1946, the acting general manager for The Alaska Railroad issued General Circular No. 580 which provided in part as follows:
Pursuant to wage negotiations and Supplement No. 40 to Wage Schedule No. 16, effective July 1,1945, the *964 hourly, daily, monthly, per annum and mileage rates of pay for employees of The Alaska Railroad, shown in Wage Schedule No. 16 as amended by Supplements No. 1 to 61, inclusive, are increased as follows:
(a) Under the provisions of this circular the operating groups were increased retroactively to July 1, 1945, by approximately 20 percent, except that the monthly pay for hostlers and engine watchmen was changed from the minimum guarantee for a calendar month to a “base rate” with overtime at one and one-half the regular rates for all work in excess of forty hours a week, similar to that provided for nonoperating employees, and with increases in their hourly rates averaging approximately 40 percent.
(b) Circular No. 580 also provided for 23 percent increases on the first $2,900 of the January 1,1946, “basic rate” for nonoperating employees of The Alaska Railroad, retroactively effective to July 1, 1945, with certain exceptions as follows:
(1) For all hourly employees, except longshoremen and Eska Mine employees, with a minimum of $1.15 per hour after such 23 percent increase, $1.56 per hour minimum for first-class carpenters, blacksmiths and painters, and $1.48 minimum for second-class carpenters.
(2) For all per diem employees except that those whose basic pay exceeded $7.94 per day would receive a flat increase of $1.83 per day (23% of $7.94).
(3) For all monthly employees, except Eska Mine, Eska mess, river boat, Whittier Power Plant employees, supervisor (mechanical department) Whittier, hostler group and those stationed outside of Alaska, with provision that those whose basic salary exceeded $241.66 per month would be paid a flat increase of $55.58 per month (23% of $241.66).
(4) For all annual employees, except the general manager, the special consultant, and those paid $1. per year, with provision that those whose basic salary was in excess of $2,900 per year would receive a flat increase of $666.96 per year, (23% of $2,900).
The increases thus provided for a forty-hour week more than offset the 21.667 percent allowance for a forty-eight hour week under the War Overtime Pay Act of 1943, which had expired June 30,1945.
*965 25. Since General Circular No. 574 and Supplement No. 52 to Wage Schedule No. 16 provided for an administrative workweek of forty-eight hours with the first forty hours constituting the basic workweek and with hours in excess of forty compensated at one and one-half times the regular rate, one result of the Federal Employees Pay Act of 1945 was to give the employees of The Alaska Railroad covered by that act an increase in compensation of approximately 30 percent.
The wage rates provided in Supplement No. 1 to General Circular No. 574 and General Circular No. 580, referred to in findings 23 and 24, were for the purpose of giving similar increases to other employees who were held not to have been covered by the act, and also to place all of the employees on substantially the same basis as far as increases are concerned. Thus substantially all of the regular nonoperating employees of The Alaska Railroad had basic pay established on a forty-hour week with an allowance of one and one-half the regular rates for work in excess of the forty-hour week from and after July 1, 1945, including administrative, accounting and clerical groups.
Special groups, including (a) river steamboat employees, (b)' Eska Mine employees, and (c) longshoremen, were included in separate agreements with representatives of those groups of employees.
26. In 1947, The Alaska Railroad employed labor consultants to make a survey of its wage rates and wage payment practices. After the publication of their report, the management of the railroad and representatives of its employees joined in protracted negotiations-with respect to the wage rates. They were unable to reach any agreement and the matter was eventually referred to the Secretary of the Interior.
April 30,1948, the Secretary of the Interior, after hearings in Washington, D. C., where representatives of the employees of the railroad were present and presented their views orally, supplemented later by a written statement, but without having secured the approval of the employees’ representatives, issued his Order 2424 establishing wage rates for the railroad employees, effective May 1, 1948, which in certain respects were increases over previous wage rates.
*966 The rates established in this order were classified in accordance with Interstate Commerce Commission classifications and predicated upon corresponding classifications and rates for employees of the Northern Pacific Railroad, with cost of living differential in Alaska, more particularly reported in finding 6 herein.
Section 10 of Order No. 2424 reads as follows:
Section 10. The rates of pay of employees in official, professional, administrative, and supervisory positions shall be established as nearly as may be in accordance with the principles set forth in this Order, except that such rates of pay shall also be in reasonable conformity with the pay standards established for similar positions in the Federal classified service. If these pay standards are in conflict, the standards of the Federal classified service shall prevail.
Subsequent wage increases were made on May 16,1949, and on April 1, 1951, upon agreements reached between representatives of The Alaska Railroad and the employees’ representatives, and after approval by the Secretary of the Interior.
27. A substantial number of the nonoperating employees of The Alaska Railroad, including the clerical group, were members of the American Federation of Government Employees or National Federation of Federal Employees. These unions represented all nonoperating employees and other groups not otherwise represented by separate unions. The first agreement between the management and the American Federation of Government Employees, representing clerical groups of The Alaska Railroad, was April 17,1950. However, the clerks were represented in earlier negotiations to establish wages set forth in the wage schedules. There is no evidence that licensed river boat employees, longshoremen, or employees of the Eska Mine were represented by independent unions until about 1945 when the agreements referred to in findings 37, 38, and 39 were executed.
A customary method of handling grievances of union employees of The Alaska Railroad was to present such grievances to the local lodges in Anchorage, Alaska, and, if the local lodges considered it advisable the grievance would be presented by the local chairmen to the grand lodges. This *967 method was adopted with regard to the failure of The Alaska Railroad to apply section 23 to its employees, as requested by the employees. Following the adverse decision of the Comptroller General of July 13,1934, referred to in finding 10, to the effect that section 23 of the act of March 28, 1934, was inapplicable to employees of The Alaska Railroad, representatives of the employees tried in various ways to have the decision reversed or to obtain the forty-hour week through the enactment of appropriate legislation, all of which efforts failed.
In their efforts to secure the benefit of section 23 of the act of March 28,1934, both the local lodges and the grand lodge enlisted the aid of the Honorable Anthony J. Dimond, delegate of Alaska to the Congress, who not only conferred with a representative of the Comptroller General in 1934 or 1935 but also introduced bills in Congress in 1936,1937,1939, and 1941 which would have specifically brought the employees of The Alaska Railroad within the provisions of that act. In each case the Secretary of the Interior recommended against the enactment of these bills and none of them were enacted into law. Delegate Dimond advised the representatives of the union to carry their cases to court.
In a letter dated October 17, 1946, the attorneys for the plaintiffs in these proceedings made demand upon the Secretary of the Interior for payment for overtime work performed in excess of forty hours per week since March 28,1934, in accordance with the provisions of section 23 of the act of March 28,1934, for “those persons who were employed by The Alaska Railroad on or after the 28th day of March 1934, in positions not coming under the provisions of The Classification Act of 1923 (Act of Mar. 4,1923, ch. 265, 42 Stat. 1488, Title 5, ch. 13, Sec. 661U. S. C.), and excepting policy-making, administrative and clerical positions, including but not necessarily limited to employees paid on an annual (or multi-annual), monthly, or quarterly, weekly, daily, hourly, or piecework basis, and likewise including but not necessarily limited to employees coming within the traditional classes of railway employees, namely, trainmen, maintenance-of-way employees, mechanical and shop forces, cooks and waiters, and longshoremen”. The first suits filed by members of the *968 nonoperating group were those of Poggas v. United States, filed March 19, 1947, and Parmenter v. United States, No. 48567, and Nelson v. United States. No. 48566, filed February 26, 1948.
28. Traditionally, workers on American railroads, including The Alaska Eailroad, are classified in two groups: (1) operating employees, and (2) nonoperating employees. Operating employees are the train and engine crews, i. e., the engineer, fireman, brakeman, conductor and road baggage-man, who operate and work upon the trains while they are in motion. The nonoperating employees include all other and the great majority of employees, such as maintenance-of-way, maintenance of bridges and buildings, shop craft, transportation (such as telegraphers, dispatchers, etc.), and clerical employees, etc.
29. The services performed by administrative, accounting, and clerical employees of The Alaska Eailroad. are similar to the services performed by employees of like classification on American railroads with minor variations to meet local conditions. In the wage agreements with The Alaska Eail-road most of these employees are included under the general description of “clerks” and they constitute one of the most numerous groups of employees of The Alaska Eailroad. Many of them belong to the American Federation of Government Employees which union represents all nonoperating employees (not otherwise represented) in negotiations with The Alaska Eailroad for wage agreements. The following der scriptions of clerks appear in the agreement between the American Federation of Government Employees and The Alaska Eailroad, effective April 17,1950:
(b) Group 1 — Clerks as defined in the following paragraph :
Clerical employees being those who regularly devote not less than four (4) hours per day in writing and calculating incident to keeping records and accounts, writing and transcribing letters, bills, reports, statements and similar work, and to the operation of mechanical equipment and devices including teletypewriters, in connection with or in lieu of such duties and work.
(c) GROUP 2 — Clerks such as the following:
Other office, dock, station and stores employees such as dock foremen, freight house foremen, assistant freight *969 bouse foremen, freight truckers, crane foremen, yardmen, cold storage operators, warehousemen, truck drivers, delivery clerks, watchmen, janitor watchmen, janitors, custodians, laborers employed in and around station, storehouses and warehouses, office boys, call boys, messengers, elevator operators, switchboard operators, chore boys, train announcers, gatemen, baggage and parcel room employees (other than clerks), station helpers, employees engaged in assorting waybills and/or tickets, operators of office or station equipment devices, and appliances or machines for perforating, addressing envelopes, numbering claims and other papers, gathering and distributing mail, adjusting dictating machine cylinders, and other analogous service.
The education, experience, training and skill required of these employees as a condition of employment vary greatly from accountants and engineers, where professional training and experience were required, to employees performing simple tasks involving manual labor where little or no training, experience, or skill was required. The salaries and wages of these employees are fixed by the same process, at the same time, and in the same manner as the salaries and wages of other nonoperating employees. In general these salaries and wages have been based on those paid by railroads in the United States, principally the Northern Pacific Eailroad, plus a differential to compensate for higher living costs in Alaska.
30. The administrative office headquarters of The Alaska Eailroad is located in Anchorage, Alaska, where most of the administrative, accounting and clerical work are performed. However, some work of that character is required outside of Anchorage and at stations along the railroad.
For purposes of operation the railroad is divided into divisions as follows:

Miles

Seward to Anchorage_114.3
Anchorage to Carry_134.2
Curry to Healy_109.6
Healy to Fairbanks_112.2
In addition, there was a spur line division for passenger service from Portage to Whittier and return which was included in the run from Anchorage to Whittier and return for a round trip distance of 125 miles.
*970 31. Prior to July 1, 1945, administrative, accounting and clerical employees were paid on a monthly basis. Effective July 1,1945, they were placed on an hourly basis. Prior to April 19, 1933, all office employees at the Anchorage headquarters of The Alaska Eailroad, including the administrative, accounting and clerical group, were regularly employed seven hours per day, six days per week, except for the period October 1 to April 30 of certain years when they worked thirty-nine hours (5 days of 7 hours each and 4 hours on Saturday). On April 19,1933, The Alaska Railroad issued General Circular No. 326 which read in part as follows:
Hereafter, four hours, exclusive of time for luncheon, shall constitute a day’s work on Saturdays, for the following employees at Anchorage: Office Employees; Store Department Employees; Bridge & Building Gang and Mechanical Department Forces; Pkovided, That the head of the Department having supervision or control of such employees may, in emergency, or in the protection of life, health or property, require any employee to remain on duty on Saturday afternoon and such employee may be given not exceeding the equivalent time off during the following week, if and when he may be spared.
Thereafter and continuing until February 9, 1942, with the exception of a short period in 1934 when the forty hour week was applied (see finding 10), all office workers of The Alaska Railroad employed at Anchorage worked on a thirty-nine hour week schedule (5 days of 7 hours each and 4 hours on Saturday). All other nonoperating employees employed at Anchorage were on a forty-four hour week schedule from prior to March 28, 1934, until January 9, 1943, except for the short period in 1934 just referred to where the forty hour week was applied (5 days of 8 hours each and 4 hours on Saturday). A few employees in Anchorage were required to work on Saturday afternoon — sometimes regularly and sometimes irregularly. In such cases, however, equivalent time was given during the following week.
32. By General Circular No. 475, dated February 5, 1942, administrative, accounting and clerical employees were placed on a forty-four hour week, that circular reading in part as follows:
*971 Pursuant to Order No. 1633, issued January 8, 1942, by the Secretary of the Interior, effective February 9, 1942, the hours of service for supervisory, clerical and other employees of The Alaska Eailroad now working only seven (7) hours per day, thirty-nine (39) hours per week basis, will be changed to an eight (8) hour day, forty-four (44) hour per week basis.
Effective January 9, 1943, an administrative workweek of forty-eight hours was established for these employees and all other nonoperating employees, consisting of six days of eight hours each, and that continued until September 1,1949, when all nonoperating employees (with possible minor exceptions) were placed on a forty hour week.
Beginning May 1,1943, and continuing until July 1,1945, all monthly or annual employees, including administrative, accounting and clerical employees, were paid overtime in accordance with the War Overtime Pay Act of 1943. Effective July 1, 1945, these employees were paid overtime for hours of work in excess of forty hours per week in accordance with the provisions of the Federal Employees Pay Act of 1945. Since September 1,1949, the regular workweek of these employees has been forty hours and overtime at one and one-half times the regular rates has been paid for work required in excess of forty hours.
For the calendar years 1934 to 1937, inclusive, the following holidays were observed at the headquarters of The Alaska Eailroad and as far as practicable in the field:
New Year’s Day
Washington’s Birthday
Decoration Day
Independence Day
Labor Day
Thanksgiving Day
Christmas Day
In addition to the foregoing, Armistice Day was included for the years 1938 to 1941, inclusive. For the year 1942, Armistice Day was excluded as a holiday but the other days mentioned were included. For the years 1943 and 1944, Christmas Day was the only holiday observed. During 1945, the only holidays observed were Labor Day, Armistice Day, Thanksgiving Day, and Christmas Day.
*972 33. In 1923 tbe steamboat service formerly operated by tbe Army on tbe Tanana and lower Yukon Eivers was taken over by Tbe Alaska Eailroad starting at Nenana, a station of tbe railroad on the Tanana Eiver. Tbe boats operate down tbe Tanana about 75 miles to its junction with the Yukon Eiver and then proceed down the Yukon about 800 miles to Marshall City and return, tbe round trip normally taking about two weeks. Stops are made at various points along the way. The boats carry all kinds of freight and formerly carried mail and passengers. The vessels are small stern-wheelers capable of carrying about 175 tons of cargo, all on deck, and of pushing a barge carrying from 275 to 375 tons of cargo. The operation is under the jurisdiction of the transportation department of The Alaska Eailroad.
The operation is a seasonal one starting with the break-up of the ice in the Tanana Eiver about May 20 and ending shortly after the first of October. The operating season is estimated at five months and ten days, that is, 160 days. For a short time prior to the beginning of the operating season some of the steamboat employees are employed in getting the boats ready for service and after the season closes they are engaged in laying up the boats for the winter.
34. The employees on these steamboats fall into three classes: (1) licensed personnel; (2) unlicensed personnel; and (3) purser. The licensed personnel consist of those officers and members who are required by the United States Coast Guard to be licensed and include captain, pilot, first mate, and second mate, all in the deck department, and the chief engineer, assistant engineer, and third engineer, in the engineering department. They all work under individual contracts for a stipulated guaranteed sum for each season, as more fully hereinafter described.
Unlicensed personnel consist of a minimum of about eight deck hands, two oilers, and three firemen, and all employees in the steward’s department. These employees are paid on a monthly basis similar to other nonoperating employees of the railroad.
The purser is the managerial officer on the boat and handles all administrative matters. The purser may or may not *973 work tmder a seasonal contract, but wben be is under contract be is not permitted to serve in any capacity on tbe railroad as a clerk.
35. During tbe navigation seasons covering tbe entire period of these claims, licensed personnel were on duty six hours and off six hours, so that their regular working schedule was twelve hours a day, seven days a week, at all times that the boat was in operation. This was the same schedule as that performed by officers on the Federal Barge Line of the Inland Waterways Corporation. While the boats were docked at the Nenana terminal, these officials were on duty eight hours a day, including Sundays. Whenever they were employed prior or subsequent to the navigation season, they worked eight hours a day, six days a week.
Unlicensed personnel regularly work eight hours a day, seven days a week, while working on the steamboats, except deckhands who have irregular hours and work intermittently as the occasion requires.
36. When The Alaska Railroad commenced its river boat operations in 1923, the management established compensation for those employees at levels comparable with those being paid by a privately operated company in that area. Thereafter adjustments in pay were made from time to time in line with agreements made with other railroad employees, river boat employees being given substantially the same consideration as to wages as the nonoperating employees of the railroad.
Unlicensed employees were paid on a monthly basis and received administrative increases in pay corresponding to increases granted nonoperating employees of the railroad. They received overtime pay under the War Overtime Pay Act of 1943 beginning May 1,1943, and overtime pay in excess of forty hours a week in accordance with the Federal Employees Pay Act of 1945 after June 30,1945. Their wages were fixed in the same manner as other employees of the railroad and in negotiations with the railroad for wage adjustments they were represented by the American Federation of Government Employees. They earned both annual and sick leave in the same manner as other employees.
*974 Prior to July 1946, licensed personnel before tbe opening of each navigation season entered into individual contracts which stipulated the total sum to be paid according to the classification of the individual, such contracts being identical in form except for the lump sum amounts. Partial payments were specified in the contracts at approximately one-eighth of the total as monthly payments for the five months of operation and the balance of about three-eighths of the total guaranteed sum was paid at the end of the season. The contracts provided allowances for travel and subsistence expense from Seattle, Washington, where these employees were usually located during the winter, to Nenana, Alaska, at the beginning of the season and return at the close of the season. All employees working on boats were furnished board and quarters. No compensation in addition to the agreed seasonal pay was given for hours in excess of forty hours per week. However, starting with the 1944 season, their annual compensation was increased by an amount equal to the increase which other employees received under the War Overtime Pay Act of 1943.
37. In 1946, an agreement was negotiated covering the compensation of licensed personnel, retroactive to July 1, 1945. However, the Comptroller General ruled against the retroactive application of that agreement and the 30 percent increase provided therein did not become effective until 1946. The compensation specified in this agreement was based on that paid employees in comparable positions in the Inland Waterways Service, then a Federally operated steamboat service on the Mississippi Eiver. The seasonal pay provided for an average season of five months and ten days (160 days) and was equal to the pay for a comparable position with Inland Waterways for eight months (240 days).
A further agreement was entered into by The Alaska Kail-road with the Alaska Kiver Boatmen’s Union, effective until November 1,1951. That agreement contained the following provision:
In establishing wages on The Alaska Kailroad Kiver Boats, wages for the Federal Barge Lines (Inland Waterways) will be applied on an eight (8) months basis in determining the monthly and seasonal wages of such employees.
*975 The wages tabulated in this agreement averaged approximately 20 percent greater than those in the 1946 agreement as shown by the following tabulation:

Both of these agreements provided for travel allowances between Seattle, Washington, and Nenana, or such other point where work was commenced in accordance with Standard Government Travel Regulations.
On occasions the licensed personnel were employed for periods of time prior to the navigation season to get the boats in shape and for periods subsequent to the season to lay the boats up. In such case, they normally worked forty-eight, hours per week, at least subsequent to July 1,1945, and were paid overtime for hours in excess of forty per week at the rate specified in the Federal Employees Pay Act of 1945. Such employment was separate and distinct from that covered by the seasonal contract. They were paid when sick during the contract season but did not receive annual leave until about 1950.
38. The Eska Mine was a coal producing property which was owned by The Alaska Railroad. Its production costs were high and it was maintained principally as an emergency reserve. It was operated for' a brief period in 1932 or 1933 when it was opened because of an explosion at a neighboring privately owned mine. The wages agreed upon for that period were based upon the wages being paid at the privately owned mine. The mine was reopened in 1941 and operated continuously until June 30, 1946. It has not been operated since the latter date. The wages and hours of work were fixed in relation to those prevailing in a privately owned mine in the neighborhood.
On July 1,1945, a memorandum of agreement was entered into by The Alaska Railroad and The United Mine Workers *976 of America, Local No. 7901, applicable to employees of the Eska Mine. That agreement provided a rate of $1.37 per hour for miners working inside the mine and $1.27 per hour for helpers (muckers) as compared with $1.3625 and $1.1625 per hour respectively in Wage Schedule No. 16. It also provided for a regular workweek of six days, and a work day of eight hours and forty minutes, less ten minutes a day deduction for entering and leaving the mine so long as miners came to the surface for lunch.
The first seven hours of work each day was payable at straight time, the remaining one and one-half hours a day at one and one-half the regular rate, and all time in excess of thirty-five hours a week was payable as overtime. Work on Sundays was payable at double the regular rate after six days of work was consecutively performed. Double time was also payable for work on holidays.
39. Until January 2, 1947, when a contract was let to a private stevedoring corporation, the Northern Stevedoring Company, The Alaska Eailroad performed its own stevedor-ing operations at Seward and Nenana and employed longshoremen for that purpose. The first collective agreement between The Alaska Kailroad and longshoremen was that of October 16, 1945. It provided for a basic work day of eight hours, with the rate of $1.75 per hour for the first six hours and $1.85 per hour for all work in excess of six hours a day, whenever work shifts were required including Saturdays and Sundays. The above agreement was superseded by an agreement dated June 15, 1946, which increased the hourly rate of pay to $2 between 8 a. m., and 5 p. m., for the first six hours within that period and all other hours at the overtime rate of $2.25 per hour. All hours worked on Saturdays, Sundays, and holidays were paid for at the overtime rate.
These agreements provided that men on duty would be permitted to work longer than eight hours a day in order to release a ship when other men were not available but not longer than sixteen hours without a rest period of at least eight hours. Calls to work were made in accordance with the men’s seniority list posted January 1 and July 1, but inexpe *977 rienced men could not obtain permanent seniority until they had served ninety calendar days.
The wage rates stipulated in these agreements followed the wage pattern set for longshoremen in Seattle with the addition of approximately 25 percent for the Alaska differential. Prior to these agreements, the longshoremen’s wage rates were regularly set forth in earlier wage schedules, as shown in finding 20, and were predicated upon the prevailing rates for the industry.
These longshoremen, as in the American maritime industry, were employed on a casual or irregular basis, that is, they were called for work only when vessels were in dock for loading or unloading. They usually worked a minimum of ten hours a day when work was available. They were paid only when work was performed and had no guarantee of pay. Neither did they earn or accrue vacation or sick leave. They did have commissary privileges, passes for free travel on the railroad, Government retirement, were afforded medical care, and other privileges as might accrue to regular employees.
conclusion op law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover and judgments will be entered to that effect. The amounts of recovery will be determined pursuant to Rule 38 (c) of the Rules of this court.